JUDE E. NAZARETH, Esq.
Nevada Bar No. 10695
Post Office Box 401506
Las Vegas, NV  89140
(702) 948-7474
JEdward@MNLawOnline.com

Attorney for Plaintiff,
Robert D. Barnhart

### UNITED STATES DISTRICT COURT

### DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT D. BARNHART, | )    **Case No.: 2:10-cv-01070-RLH-PAL** |
|       Plaintiff, | ) |
| | )    **PLAINTIFF'S RESPONSE TO** |
|     vs. | )    **DEFENDANT CAPITAL ONE'S** |
| | )    **MOTION FOR RECONSIDERATION,** |
| CHEVY CHASE BANK, FSB; | )    **MOTION TO EXPUNGE, AND MOTION** |
| MORTGAGE ELECTRONIC | )    **TO STRIKE (OMNIBUS RESPONSE)** |
| REGISTRATION SYSTEMS, INC., T.D. | ) |
| SERVICE COMPANY; CAPITAL | ) |
| ONE, N.A.; et al. | ) |
| | ) |
|       Defendants. | ) |

**COMES NOW PLAINTIFF ROBERT D. BARNHART WHO RESPONDS TO DEFENDANT CAPITAL ONE'S MOTION FOR RECONSIDERATION OF THE COURT'S DECISION ((Document No. 57, dated December 16, 2010),  ITS MOTION TO EXPUNGE (Document No. 56, dated December 15, 2010),   AND ITS MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT (Document No. 60, dated December 27, 2010) AS FOLLOWS:**

### PREFACE

Plaintiff and Defendant Capital One, N.A., both have pending Motions for Clarification and Reconsideration, respectively, concerning the Court's Decision dated December 1, 2010,

1  which are prior to and have the potential to impact the said Motion to Strike, however Plaintiff

2  intends this pleading to respond to Defendant's aforesaid Motions.

3      Plaintiff objects to Defendant Capital One N.A.'s Response to his Motion for

4  Clarification as late in that he is unaware of any grant by the Court of an extension of time to

5  respond.

6      Plaintiff, in the matter of *Barnhart vs. T.D. Service Co., Inc*., (Case No. 2:10-cv-01780-

7  RLH -PAL) continues to challenge the Defendant's standing and capacity to bring its Petition for

8  Removal and continues to object to the grant of removal, dismissal of Plaintiff's complaint, and

9  consolidation as contrary to the law and *ultra vires*.  Without waiving objections, Plaintiff filed

10 its own courtesy Motion for Reconsideration under said case number prior to appeal, and there

11 has been no response or decision to that motion.

12 **OMNIBUS RESPONSE**

13 **I.**

14 **DISGUISE, DECEPTION, AND PREDATORY LENDING LEADS TO RESCISSION**

15 **AND VOID SECURITY AS WELL AS THE STATUS OF UNSECURED CREDITOR**

16 **(PERHAPS NOT A CREDITOR AT ALL) FOR THE DEFENDANTS *VIS A VIS* THE**

17 **PROPERTY OF CONCERN**

18     Several courts around the nation and within this District[1] have commented on the

19 confusing 'facts' presented in cases involving mortgage loan transactions like the instance case,

20 and the responsibility for all the confusion, even contradiction, rests entirely with the

21 Defendants, who drew all the documents, designed the loan,  and  whose motivation  was to

22 obfuscate the record and thereby try to distance themselves from what they  knew constituted, for

23 want of a better word, a predatory loan made in violation of the letter and spirit of relevant

24 consumer protection laws.  A basic definition of a predatory loan, as is the subject of  this

25 litigation, is one  whose terms, including type and cost of  loan, has not been accurately disclosed

26 _____

27 [1] *Weingartner vs. Chase Home Finance, LLC*, No. 09-cv0-0225 (Fed. Dist. Ct. Nevada).

28

to the Borrower  and has no happy ending, instead inevitably leading  to undisclosed, grossly inflated payments (known to the Lender but not conspicuously disclosed),   resulting in  a  one sided, *manna from heaven* for the Lender of  increased fees,  exorbitant financial charges, unaffordable prepayment penalties,  and,  ultimately,  the certainty of foreclosure and recovery of the security by the Lender (*See Andrews v. Chevy Chase Bank*, 2007 Lexis 3162).

At the same time, the Courts have sometimes required plaintiffs, such as Barnhart, to essentially prove up in their opening pleadings what is a negative--non-disclosure.  In the case before the Bench, Plaintiff, as more fully set forth below, has done so with the assistance of  the documents of  record, admissions by the Defendants, the Requests of the Defendants for Judicial Notice, and research that establish more than just the aforesaid, and, instead, establishes  that the loan of concern, and the manner in which Defendants made it, *itself*  violated the law and, thereby,  the Defendants' own conduct rendered themselves to be at best unsecured creditors of the Plaintiff; perhaps, not a creditor at all; and, if a creditor, one against whom Plaintiff has rightly exercised his right of rescission without having to pay for the now void security.[2]  (*See* 15 USC § 1635(b) and *Fairley vs. Turan-Foley Imps., Inc*., 65 F.3d 475, 482 (5th Cir. 1995).

**1.**

After the trial of this matter, the trier of fact most probably would find all of the above, and such a determination would result in the legal conclusion that the Defendants' own  conduct and pleadings of  record  put themselves into the aforementioned  position with  no  rights whatsoever to the property subject to this litigation.   In this regard, consider the following:

---

[2]  Defendants have repeatedly supplied the Court with loan documents, upwards of 194 pages at a time, and even asked the Court to take Judicial Notice thereof; however they have never produced nor disclosed to the court the documents in Exhibit here.  It is Plaintiff's belief the _absence_ of  these documents was intentional so that the said documents would not otherwise impeach counsel's repeated (and false) assertion that CCB was not at the table on the Closing date, nor was it the Lender and Creditor of the Plaintiff, except by later assignment, and, here again, the _absence_ of any such later assignment (as detailed in this pleading) is itself both telling and works to impeach not only counsel's assertions but also Defendant's standing and status as a secured creditor herein.  The Court in all of this is trying to ascertain whether Defendants were disclosing to the Plaintiff in the conduct of their business with him, yet it appears to the Plaintiff that the Defendants are being less than disclosing with this Court.

1  Silver State Bank, Inc.. ("SSB") was at all times nothing more than 'beard' or  stalking horse for
2  the other named defendants, including Chevy Chase Bank, N.A. ("CCB") and Capital One, N.A.
3  ("CapOne"), and CCB was at the table and involved as the Lender and Creditor in this matter
4  from DAY ONE.

5       a.     Although counsel for the Defendants have repeatedly provided volumes
6  of pages to the record and asked the Court to take Judicial Notice of many,
7  there is attached hereto a copy of loan documents obtained from other and
8  different counsel for one of the Defendants, and, as the reader can ascertain
9  from even a cursory review of the papers, CCB was the indicated Lender and
10  Creditor on the documents. (Exhibit "1") CCB's GENERAL CLOSING
11  INSTRUCTIONS, (Exhibit "2") CCB's SUPPOSED Allonge To Promissory
12  Note, (Exhibit "3")  Chevy Chase Bank, F.S.B. Wholesale Lending Division's
13  Document,   (Exhibit "4")  CCB's   ADDENDUM   TO   CLOSING
14  INSTRUCTIONS being Exhibits not seen by the Court, all  as attached. A
15  review of the same appears immediately below.

16       b.     CCB's GENERAL CLOSING INSTRUCTIONS documents included in
17  (Exhibit "1")  "Stamped" CCB/Barnhart page 66 of 194 reflect  CCB's role as
18  Lender and  Creditor herein, quoting from the document:

19  **GENERAL CLOSING INSTRUCTIONS Dated July 5,**
20  **2006, Loan No. 9990017776DS**

21  "Do not close or fund this loan unless ALL conditions in these
   closing instructions and any supplemental closing instructions
22  have been satisfied the total consideration in this transaction
   except for but loan proceeds and approved secondary financing
23  must pass to you in the form of cash. Do not close or fund this
   loan if you have knowledge of a concurrent or subsequent
24  transaction which would transfer the subject property."

25  **HAZARD INSURANCE**
   **3. Loss payee/mortgagee clause to read "Chevy Chase Bank**
26  **F.S.B."  (the original lender)**

27

28

Closing Instructions and Loss payee/ mortgagee refers only to CCB as the original Lender and Creditor herein.   This, of course, is contrary to the repeated and false assertions by opposing counsel that CCB and CapOne had nothing to do with the loan transactions--all parties are aware that said assertion is untrue.

c.      Moreover, there is a document purported to be an "Allonge" stamped over the seal of CCB, (Exhibit "2"), "Stamped" CCB/Barnhart page 16 of 194 as attached, whereby CCB names itself as the Originating Lender and Creditor and Note Holder, not SSB.  (More on this document below and its vain attempt to disguise CCB's role whilst preserving its Creditor status, an attempt that by and under applicable law was doomed to failure.)

d.      An audit of the documents to ascertain loan numbers likewise reveals (consistent with (c ) above) that CCB was involved at Closing and thereafter as the Lender and Creditor, witness   Documents presented by the Defendants themselves in Defendant Capital One NA's Request for Judicial Notice in Support of Motion to Dismiss (Doc 18, Case 2:10-cv-01070-RLH-PAL, filed on 07-16-2010), including but not limited to:

(i) Capital One's Exhibits A and B Showing original Loan Number 9990017776DS Silver State Financial;

(ii) Capital One's Exhibits C, Notice of Default Showing the CCB Loan No. Of 0556069672/BARNHART (using a different loan number);

(iii) Capital One's Exhibits D, Notice of Trustee's Sale Showing the CCB Loan  No. of 0556069672/BARNHART  (using a different loan number);

(iv) Capital One's Exhibits E, Notice of Trustee's Sale Showing the CCB Loan  No. of  0556069672/BARNHART (using a different loan number);

(v) Capital One's Exhibits F, Substitution of Trustee Showing the CCB No. of 0556069672/BARNHART (using a different loan number).

e.        Moreover, as for funding the loan, the Closing documents were signed on July 5, 2006, however the loan was not funded and recorded until July 18, 2006 and the funds for the loan came from CCB BEFORE any recordation of the documentation herein, making CCB the original Lender and Creditor of the Plaintiff.   Plaintiff has discovered more in the above regard, including the following, concerning CCB's real but not disclosed conduct, and here it is important to emphasize – disclosure is mandated by Statute and non-disclosure is a violation of  various laws, including the Truth in Lending Act ("TILA"). The loan in question was actually an original Chevy Chase Loan product that was built, designed, and engineered to fail from its inception. Chevy Chase Bank as the Lender offered their loan products to be peddled and sold by correspondent loan broker SSM.   This loan concealed hidden terms, non-disclosures, prepayment penalties, conflicting terms, contradicting Truth in Lending Act Disclosure Statements ("TILDS"),  contradicting payment letters to borrower at closing, not disclosing the true lender's name and address on the TILDS, using two different loan numbers, identifying two different lenders on closing instructions, and  employing and advertising extremely low "teaser rates" while not properly disclosing that these rates would dramatically increase, resulting in monthly payments which were beyond the capacity for  Barnhart to meet the alleged fully indexed rate of 19.90%, given the financial/income information provided by  consumer to the Defendants. The manner in which this CCB loan product was marketed by the Bank and the terms of this CCB loan has been recognized by experts in the field as "the most complicated mortgage product ever marketed to consumers." (Carrillo, "The Sound of Silence: Class Action Declaratory Rescission Under the Truth in Lending Act" (Dated August 21, 2008), at page 25,    CCB's role as Lender and Creditor should have been disclosed along with other mandated disclosures addressed herein. (15 USC §

1601(a), Reg. Z, 12 C.F.R. § 226.17(a) et al.) (The purpose of TILA is "to assure a meaningful disclosure of credit terms"). And, the disclosures are required to be made "clearly and conspicuously." (15 USC § 1632 (a), Reg. Z, 12 C.F.R. § 226).

(f)     Likewise, *see* (Exhibit "3"), as attached hereto, Chevy Chase Bank, F.S.B., Wholesale Lending Division's own document as follows, further establishing this loan as a CCB original loan.  Reading from the document:

> Cashflow LIBOR ARM - Frequently Asked Questions their Document # WRF802 marked in footnote-

> "*This Q&A is solely for the use of mortgage brokers, correspondent lenders, and other arrangers of credit and is not to be distributed to potential loan applicants. The Cashflow programs are subject to change and/or cancellation without prior notice.*"

> Listed on page 7 of 9 **"*What are the Cashflow ARM life caps?*"**
> "Your borrower can choose between 19.90%, 13.75%, or 9.95% life caps, which are available on all of the LIBOR Cashflow ARM programs. Only the 13.75% life cap is available on the MTA Cashflow ARM.  The Chevy Chase Wholesale rate sheet shows margins and yield spread premiums at a 19.90% life cap. Refer to our rate sheet for the price adjustments for a 13.75% or 9.95% life cap."

The above references undisclosed market incentives that **CCB,** the Lender, used to "steer" the Loan Broker SSM to "choose" one of its products over another when dealing with consumers such as Barnhart.   The yield-spread premium ("YSP") is such a device.   A YSP is something one cannot easily identify from the loan documents, but, once identified, it serves as a reminder that the Lender paid a trusted broker, here SSM, to "sell" a more expensive CCB product than the consumer otherwise might have qualified for.  (M. Courchane, B. Surette, P. Zorn, *Subprime Borrowers: Mortgage Transitions and Outcomes*, 29 J. Real Est. Fin. & Econ., 365 (2004); 15 USC § 1638(a); 12 C.F.R. § 226.10).

CCB's use of SSM as a broker is clear, and, as shown herein, CCB paid SSM for this same service as its broker.  At the same time, it is well known that this sort of brokerage can work against the consumers such as Barnhart (no doubt

it did in the instance case), and it is well recognized in at least one empirical study that more subprime than prime borrowers relied on mortgage brokers to help maneuver their way around the credit market, and the accompanying maze of charges, fees and interest rates became a virtual sink point–some charges being folded into the cost of the loan (to be paid off with interest), others  not, all with insufficient disclosures in accordance with the law. (*Atty. Gen., Dept. of Legal Affairs, State of  Florida vs. Countrywide*, Case No. 08 30105, June, 2008).

Specific to the above, during at the time of the subject loan, mortgage brokers and banks alike are required by law, including TILA, to disclose all YSP within three (3) days of the borrower's initial application on the Good Faith Estimate of Closing Costs, and then again as YSP as a fee "POC" (Paid Outside Closing) on page 2 of the HUD-1 Settlement Statement, inside the margin, away from the column marked "Paid from Borrower's funds at Settlement." (15 USC § 1638(a); 12 C.F.R. § 226.4(a)(3).

Barnhart loan, per the above, contained YSP from CCB to SSM as its broker, and, as the documents evidence, Barnhart was not given any such disclosures by SSB as the broker or CCB as the real Lender and Creditor, and failure to disclose again violates applicable law including TILA.   Likewise, CCB itself, being the Lender, violated the Real Estate Settlement Procedures Act ("RESPA") and TILA, before, during and at Closing by not disclosing in the manner set forth above the proper YSP paid by CCB to the correspondent loan broker SSM, and the failure to so disclose makes for yet another basis for rescission herein (15 U.S.C. § 1641(c), 15 U.S.C. § 1641(e), 12C.F.R. § 226.23(a) for which Plaintiff may rescind.

These final rules protect consumers like Barnhart from unfair, abusive, or deceptive lending practices that can arise from loan originator compensation practices per se, hence the rules and the disclosure requirements and penalties

under the Law and Regulations.

The new and expanded Rules now apply to all persons and entities of whatever sort that originate loans, including mortgage brokers a like SSM and all companies that employ them, as well as mortgage loan officers employed by all depository institutions and other lenders in the United States.

These new Rules also:

- Prohibit payments to the loan originator that are based on the loan's interest rate or the terms.  Compensation that is based on a fixed percentage of the loan amount is permitted;

- Prohibit a mortgage broker or loan officer from receiving payments directly from a consumer while also receiving compensation from the creditor or another person; and further

- Prohibit a mortgage broker or loan officer from "steering" a consumer to a lender offering less favorable terms in order to increase the broker's or loan officer's compensation.

The New Rules also provide a safe harbor to facilitate compliance with the anti-steering rule, however only in this specific circumstance: Only if the consumer is presented with loan offers for each type of transaction in which the consumer expresses an interest (that is, a fixed rate loan, adjustable rate loan, or a reverse mortgage); and the loan options presented to the consumer include the following:

(1) the lowest interest rate for which the consumer qualifies;

(2) the lowest points and origination fees, and

(3) the lowest rate for which the consumer qualifies for a loan with no risky features, such as a prepayment penalty, negative amortization, or a balloon payment in the first seven years.

These Rules are effective April 1, 2011, to provide lenders and originators

time to develop new business models, implement necessary changes to      their systems, and train personnel. (Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law No: 111-203 (2010)).

The same Dodd-Frank Wall Street Reform and Consumer Protection Public Law No: 111-203 (2010) also further restricts practices concerning loan originator compensation.

SSB was nothing more than the procuring cause brokering the loan of concern on behalf of CCB, and the Defendants, and each of them, conspired to disguise and conceal and not disclose this reality to the Plaintiff even though the law bars such deceptive practice and requires full disclosure.  SSB was likewise well paid for its very limited participation herein, and SSB was, therefore, never the Lender or the Creditor of Barnhart, not in this reality.   This circumstance helps to explain the total absence of any other legal and proper evidence of any Endorsement of the Note or Assignment of the Deed of Trust in this matter between the Defendants in spite of repeated, unfounded assertions by opposing counsel that CCB/CapOne had nothing to do with this loan and came into it only by some non-existent assignment (much more in this regard below).  As more fully set forth herein, this entire loan was at all times a CCB product and transaction, and these parties never had any concern about the making of valid assignments, and the like, because in their minds this was their loan from day one.

**2.**

There are numerous consequences of what is set forth above, one of which is that the Notice of Right to Cancel that is required by law to have been served on the Plaintiff, per the above, was and is in several respects defective on its face in that it does NOT include the name or contact information of CCB, being the original Lender and Creditor herein, all in violation of relevant provisions of TILA.  The Notice is further defective in that it was not served both on the Plaintiff as borrower as well as upon all persons with an ownership interest in the property, and the latter would have and does include Mrs. Jill Barnhart, the wife of the Plaintiff, who shared in making payments and enjoyed ownership rights by way of the community

property laws of the State of Nevada upon the date of the Closing of the subject loan transactions.  Likewise, the Notice was inadequate in that the Plaintiff has and does assert  that he never received two copies of the said defective Notice, instead only one, which itself constitutes another violation of TILA, and the record in this loan transaction does not contain two copies, signed or dated, or otherwise.  And, the Notice was not presented to Barnhart as required by law, nor is it dated, which is too a requirement both of TILA and the Defendants themselves.  (*See*  15 USC § 1601 et seq.; *Rodash vs. AIB Mortgage*, 16 F.3d 1142 (11th Cir. 1994); *McKena vs. First Horizon Home Loan Corp*., 475 F.3d, 418, 419-420).

Reference in the above regard is made to (Exhibit "1") "Stamped" CCB/Barnhart page 66 of 194 being CCB's own  GENERAL CLOSING INSTRUCTIONS, Dated July 5, 2006, Loan No. 9990017776DS, quoting from the document:

> "Do not close or fund this loan unless ALL conditions in these closing instructions and any supplemental closing instructions have been satisfied the total consideration in this transaction except for but loan proceeds and approved secondary financing must pass to you in the form of cash. Do not close or fund this loan if you have knowledge of a concurrent or subsequent transaction which would transfer the subject property."
>
> "RESCISSION:"
> 1. "If the transaction is subject to rescission, provide each Borrower and each person having any ownership interest in the security property with two (2) copies of the completed Notice of Right to Cancel.  The Notice of Right to Cancel must be properly completed (including all dates) and each borrower and person given two notices must execute an acknowledgement of receipt.  Your failure to properly complete and provide the Notices of Right to Cancel to each person entitled to receive them will delay this closing."
>
> 2. "No Borrower or other person having an ownership interest in the Security Property may modify or waive his or her right to rescind without our prior written consent."

Only one (1) Notice of Right to Cancel was presented, and only on one (1) day, and was signed only at one time,  and the Lender at closing  asked borrower to pre-sign the conformation below, but do not date, and the same is not so signed and dated.  The Notice of Right to Cancel was never properly executed pursuant to the date acknowledgement (making The Notice of Right

to Cancel invalid).  More from the Defendants themselves in this matter follows.

Reference in the above regard is made to (Exhibit "4") "Stamped" CCB/Barnhart page 65 of  194 being CCB's own  ADDENDUM TO CLOSING INSTRUCTIONS, Dated July 5, 2006, Loan No. 9990017776DS, quoting from the document:

ADDENDUM TO CLOSING INSTRUCTIONS
" If this loan is a non-purchase money, each person who is signing the Security Instrument or who has an ownership interest in the real property being used as security for the loan must sign the enclosed Notice of Right To Cancel form and be given (2) copies of the completed form. All changes to the Notice of Right To Cancel form MUST be initialed and dated by the Borrower(s)"

Barnhart's loan was a non-purchase money loan, to this there is no dispute, hence the Notice in all these aspects and in its presentation and execution was and is defective by and under the law.   Consistent with the above, Plaintiff rescinded the loan transaction as provided by law on July 2, 2009, being (Exhibit "5") hereof, the same being of record herein, and the Defendants, and each of them, all having been served, failed to reply in a timely or appropriate manner as mandated by statutory law, the same being admitted, as set out in (Exhibit "6") hereof, hence the ostensible security of the Defendants, and each of them, has become void, and the Plaintiff is not required to pay for it.   (15 USC § 1635, 1635(b), 1640; *Thomka vs. A.Z. Chevrolet, Inc*., 619 F.2d 246, 248 (3rd Cir. 1980); *Arnold v. W.D.L. Investments, Inc*., 703 F.2d 848, 849 (5th Cir. 1983);  *Swanson v. Am. Cons. Indus*., 415 F.2d 1326, 1332-1333 n.9 (7th Cir. 1969)(reversed on other grounds).

Barnhart has and does allege that on the date of his rescission, being July 2, 2009, he had the capacity to perform, and the Defendants' subsequent failure to timely reply results in rescission in accordance with 15 U.S.C. § 1635(b) whereby the security is void and for which he does not have to pay.  There is, then, no continuing issue as to any requirement for Barnhart to continue to plead ability to perform.  At the same time, his subsequent Bankruptcy, coming some

months later, was not and is not relevant.[3]

Moreover, any limitation on Barnhart's right to rescind as exercised by him per the above, could not and did not even start to run, and the transaction remained rescindable up to the time he actually rescinded, because he was not served with proper Notice of Right to Rescind. (*Complete Manual about Truth in Lending* (April 2009), page 12)).

**3.**

Other relevant failures to disclose and to act in accordance with the requirements of the law are also of record, some of which have been admitted by opposing counsel for the Defendants, and each of them, such as the willful failure to disclose to Plaintiff the actual affect of negative amortization known to them, all as required by Statute . These failures to disclose violate TILA, and they too lead to the rescission of record by the Plaintiff, a rescission that has not been denied by the Defendants and itself rendered Defendants security, is any, void.

Specifically, Defendants, by and through Counsel, have <u>admitted</u> the above-mentioned nondisclosure and TILA violation on page 12, lines 20 – 27, of Defendants' Motion to Dismiss (Document Number 16, July 16, 2010), the same being pregnant with the very admission that Defendants did *not* disclose that negative amortization in this matter was certain to occur in the subject loan nor that foreclosure was substantially certain to occur if the Plaintiff made payments according to the payment schedule presented to him. Further to this now established fact, opposing counsel wrongly concludes that to make this required disclosure would impose "additional disclosure requirements" on her clients, as if they had no such duty to so disclose,

---

[3] The split within the Ninth Circuit whether to require a plaintiff to plead the present ability to tender the loan proceeds to survive a motion to dismiss is evident. *See Kakogui v. Amer. Brokers Conduit*, No. C09-JF (HRL), 2010 WL 1265201, at *4 (N.D. Cal. Mar. 30, 2010) (listing decisions reflecting the split). At the same time, question of present ability is made moot by a failure to reply after plaintiff has rescinded. Plaintiff, however, alleges past and present ability to perform.

when, in fact, the law mandates such disclosure.  Quoting opposing counsel's admission that

Defendants did not disclose (and in fact they did not) by said page and line:

> "Moreover, with his purported "state law" claims, Plaintiff attempts to impose additional disclosure requirements onto a federally chartered institution in contravention of 12 C.F.R. § 560.2(b)(9). For example, Plaintiff seeks to require institutions to disclose that negative amortization is "certain to occur" if the borrower makes the minimum payments only, and that foreclosure is "substantially certain to occur" if the borrower makes payments according to the payment schedule."[4]

The Statutes call for disclosure -- honest, clear, consistent, unambiguous, conspicuous,

understandable, non-contradictory, full disclosure to the Plaintiff, and anything less is an

actionable violation of TILA.  15 U.S.C. § 1632(a) and 12 C.F.R. § 226.17 state that all required

disclosures must be clear and conspicuous.  12 C.F.R. § 226.19(b)(2)(vii) specifically requires

disclosure that negative amortization was *certain* to occur, requiring the Lender to "disclose any

rules relating to changes in the index, interest rate, payment, and outstanding loan balance,

including, for example, an explanation of interest rate or payment limitations, negative

amortization, and interest rate carry over."   12 C.F.R. PT 226, Supp 19 (b)(2)(vii)-2 further

dictates, "If a consumer is given the option to cap monthly payments that may result in negative

amortization, the Creditor *must* fully disclose the rules relating to the option, including the

effects of exercising the option (such as negative amortization *will* occur and the principal loan

balance will increase.  And *see* Commentary to Section 226.19(b)(2)(v) that explains  "a creditor

*must* disclose, where applicable, the possibility of negative amortization" and where the note

permits a borrower to make payments at a fixed level, "the creditor *must* fully disclose the rules

relating to the option, including the effects of exercising the option (such as negative

amortization *will* occur and the principal balance will increase."  *See also* Elizabeth Renart and

Kathleen Keest, *Truth in Lending* § 4.2.4 (5th ed. 2003), and "If a disclosure is capable of more

than one plausible interpretation, it is not clear."  Also, *Smith v. Cash Store Mgmt*, 195 F.3d 328

(7th Cir 1999), wherein it was decided the "sufficiency of TILA-mandated disclosures is to be

---

[4]  The disclosures are required under federal law TILA and State law having adopted TILA (<u>NRS 107.080</u> *et al*).

1    viewed from the standpoint of an ordinary consumer, not the perspective of a Federal Reserve

2    Board member, Federal Judge, or English professor." And, they must be viewed in the context

3    of how disclosures are made so as not to be confusing or misleading. (*Handy v. Anchor*

4    *Mortgage Corp*., 464 F.3d 760, 764 (7th Cir. 2006).

5          Plaintiff's claims concerning the loan and disclosures are cognizable, and the like has

6    been recognized as actionable by numerous Courts. (*Handy v. Anchor Mortgage Corp*., 464 F.3d

7    760, 764 (7th Cir. 2006); *Mincey v. World Savings Bank*, 614 F.2d 610, 636 (S.S.C. 2008)

8    *Plasicencia v. Lending 1st Mortgage*, No. C-07-4485 CW. 2—8 WL 1902698, at 5–6 (N.D. Cal.

9    Apr. 28, 2008); *Pham v. TJ Financial, Inc*., No. CV-08-275 ABC (JCX) 2008 WL 348589 at 2

10    (C.D. Cal., Aug. 11, 2008). *Andrews*, *vide infra*, and *Brown*, *vide infra*, the latter two cases are

11    on point relevant to the exact lender, loan type, and disclosures and loan type and disclosures,

12    respectively.

13                                     **4.**

14          There are allegations by the Plaintiff of other non-disclosures and misrepresentations by

15    the Defendants, and each of them, in violation of relevant law and TILA, and the same support

16    Plaintiff's exercise of his right to rescind, as he so did on July 2, 2010. Defendants and each of

17    them were at all times aware of the actual income of Barnhart in that the loan brokered by SSB

18    on behalf of the actual and original Lender and Creditor, being CCB, required complete income

19    documentation and verification of the same, including not only Borrower's Loan Application and

20    Credit Report showing borrower's liabilities, verification of self employment by a CPA,

21    Verification of Deposit,W-9, 4506-T Request for Transcript of Tax Return Forms, but also pay

22    receipts for proceeds received by Barnhart from various businesses with which he worked, from

23    title and escrow companies, hence, the Defendants, and each of them, were fully aware that

24    Barnhart did not qualify for the loan based upon his ability to repay the same at the alleged

25    much higher and inflated payment rate as known to them but undisclosed to Barnhart.

26          Making the subject loan, then, itself was a violation of the Law:

27               § 226.34       Prohibited acts or practices in connection with credit

28

subject to §226.32: (a) Prohibited acts or practices for loans subject to § 226.32. A creditor extending mortgage credit subject to § 226.32 shall not-- (4)  Repayment ability.  Extend credit subject to § 226.32 to a consumer based on the value of the consumer's collateral without regard to the consumer's repayment ability as of consummation, including the consumer's current and reasonably expected income, employment, assets other than the collateral, current obligations, and *mortgage-related obligations.* (Emphasis supplied)

Defendants likewise knew but did not disclose to Barnhart, per what is addressed in detail elsewhere herein, that the payments and payment schedules provided in no way covered either principal or interest, nor did they have any relationship whatsoever to the actual interest rate of the loan, hence, as a result of the same, and actual payment, and interest being levied thereon, and interest upon interest, at the higher interest rate, compounded, inflated the true payment as a result of this 'negative amortization' beyond Barnhart's ability make payments and repay the loan. This was not disclosed to the Plaintiff prior to or at closing and constitutes actionable violation of TILA. (Section 226.31 General rules**.** (c) Timing of disclosure--(1) Disclosures for certain closed-end home mortgages.  The creditor shall furnish the disclosures required by § 226.32 at least three business days prior to consummation of a mortgage transaction covered by § 226.32.)

## II.

## DEFENDANTS ARE NOT SECURED CREDITORS OF THE PLAINTIFF, AND, IF THEY ARE CREDITORS, THEY ARE UNSECURED

(Exhibit "7") the alleged Notice of Default, (Exhibit "8") the supposed Notice of Trustee's Sale, (Exhibit "9") the purported Substitution of Trustee, (Exhibit "10") the  Trustee's Deed Upon Sale, and (Exhibit "11")  the alleged Assignment of Deed of Trust ) are all attached Exhibits,  all incorporated herein, that chronicle much more about the conduct of the Defendants that lead to the legal conclusion that they have with their chicanery made themselves into no more than unsecured creditors, at best, of the Plaintiff, with no right whatsoever to claim any interest in the property of concern herein.   In much of this, the documents speak for themselves.

The Note of concern (Exhibit "2") is "Stamped" CCB/Barnhart ( page 16 of 194), and a separate document (not attached) purports to be an "Allonge." The "Allonge" as encountered by

the Plaintiff is the disguised attempt by the Defendants to endorse the Note to the Defendants CCB.  The problem for the Defendants, being a problem that they cannot overcome, is that the "Allonge" does not endorse or at all otherwise transfer the Note from SSB to anyone.  Hence, the Note was never endorsed or transferred to either Defendants CCB or CapOne, and, as a result, any suggestion that these Defendants are even unsecured creditors of the Plaintiff is unsupported in the record.  The Defendants CCB and Cap One most probably are not even Creditors of the Plaintiff.

There is no dispute that a Note is a contract to repay borrowed money.  It is a negotiable instrument governed by Article 3 of the Uniform Commercial Code ("UCC") as adopted in Nevada.  The Note itself is an unsecured debt.  Notes are personal property. Notes are negotiated by endorsement.  Notes are not subject to assignment.  A Note can only be transferred by an "Endorsement," if the Note is payable to a particular party, or by transfer of possession of the Note, if the Note is endorsed "in blank."  Endorsements must be written or stamped on the face of the Note. UCC §§ 3-205 - 3-210.  The UCC does not recognize any form of Assignment as a valid means of transferring a Note such that the transferee becomes a "holder." In the instance case, there is no endorsement whatsoever of the Note of concern from SSB to CCB, hence CCB has never become the "holder" of the said Note.  There is likewise no record of any endorsement of the said Note to Cap One, ever.

The "Allonge" produced *by* Plaintiff  is separate from the Note, not dated, not notarized not attached to the face of the Note, nor the Back for that matter, and it is signed by an unidentified person, with no stated legal capacity or authority, and with no notary or other verification.  In accordance with what is set forth herein, this document in no way qualifies as an allonge to the Note and certainly not an endorsement, especially since there was and is room on the face of the Note for Endorsement, and to be properly used, an allonge must describe the terms of the note, be dated, signed by a person with capacity and authority to sign, should be notarized and or otherwise subject to verification, and it most importantly must be "permanently affixed" to the Note.  Most jurisdictions hold that "staples" and "tape" do not constitute a

"permanent" attachment.  (*In re Canellas*, 2010 WL 57808 (Bankr. M.D. Feb. 09, 2010); U.C.C. 3-205 – 3-210 et seq).   The document no way constitutes evidence of a transfer of the Note of concern to CCB, and it is not an Endorsement of the Note by and under the law.  (See Freddie Mac Document Custody Procedures handbook, 1/10/2010).  The document also fails to set forth the required language to effect transfer by Endorsement per the U.C.C. and Guidelines as follows:

> THIS ENDORSEMENT IS TO BE ATTACHED TO AND MADE PART OF THAT CERTAIN PROMISSORY NOTE dated Month, Day, Year, made by Borrower Name Here,in favor of ABC Company, the payee, in the original principal amount of $x,xxx,xxx. Such Note is hereby transferred pursuant to the following Endorsement with the same force and effect as if such Endorsement were set forth at the end of such Note:
>
> THIS PROMISSORY NOTE is herby Endorsed and Assigned without recourse to: Acme Loan Buying Company
>
> PAY TO THE ORDER OF: Acme Loan Buying Company Seller

The intended purpose of the purported "Allonge" then is clear, however the legal effect, if any, as an endorsement, is a nullity.  The "Allonge" in question is not proof whatsoever of any endorsement of a Note.  It is smoke and mirrors and nothing more.  For the purposes of this case, the " Allonge"  is presented to the Court as evidence of  an absence of any endorsement of the Barnhart Note from SSB to CCB, and, again, there is no record whatsoever of  any endorsement from CCB to Cap One – none whatsoever.  (*See In Re Anthony Tarantola*, U.S. Bankr. Court, Dist. Az., Case No. 4:09-bk-09703-EWH, dated July 29, 2010; *Pribus vs. Bust*, 118 Cal. App. 3d 1003 (1981)).

Notes are separate legal documents from the real estate instruments that may secure the loans evidenced by the Notes by liens on real property. Notes to be transferred must be properly endorsed, and in the instance case there is no verifiable proof whatsoever that the Note was ever Endorsed and transferred to either CCB or CapOne.

With regard to the Deed of Trust of concern (Exhibit "12"), "Stamped" CCB/Barnhart

pages 17-32 of 194), the same reflects Defendant MERS to be the named Beneficiary.   In mentioning this, Plaintiff in no way means to admit that MERS is at all legally capable of being and acting as a Beneficiary *per se*, and the law seems to indicate that it has no such capacity to act as a Beneficiary or in any way affect, transfer, or assign the Deed of Trust, certainly no right whatsoever to affect, transfer, or assign the Note – no dispute as to this latter point at all.  Rather, the purpose here is to highlight for the Court that there is nothing of record at all to evidence any assignment (and Deeds of Trust are subject to assignment) of the Deed of Trust by MERS to anyone at all, not CCB, not CapOne – no one.

There is also no dispute as to what is a Mortgage, being a lien on, and an interest in, real estate.  It is a security agreement.  It creates a lien on the real estate as collateral for a debt, but it does not create the debt itself.  The rights created by a Mortgage are classified as real property and these instruments are governed by local real estate law in each jurisdiction.  The UCC has nothing to do with the creation, drafting, recording or assignment of these real estate instruments. The Deed of Trust serves the same function as a Mortgage as above stated.  Mortgage rights, including rights under a Deed of Trust, can only be transferred by a valid Assignment duly recorded in the local land records.  Mortgage rights are "estates in land" and therefore governed by the Nevada real property laws. Mortgage rights can only be transferred by a recorded assignment instrument (the "<u>Assignment</u>") to be legally effective (NRS 107.020 et seq).

With regard to the Deed of  Trust of concern, there is no probative evidence whatsoever that the Deed of Trust herein *was ever* properly assigned from MERS, the named Beneficiary, to SSB or CCB or CapOne, nor is there any recordation of any such document, and, further, there is no probative assignment whatsoever from SSB to either CCB or CapOne, nor is there any recordation of the same. And, any such assignment from SSB to CCB or CapOne would essentially transfer nothing, hence be a nullity, in that there is no evidence that SSB ever had anything to assign.

Working from the present to the recent past, Plaintiff has discovered one document that Plaintiff asserts has no legal effect; however the same requires mention herein, *to wit:* a

document entitled **Assignment of Deed of Trust,** (signed and notarized July 20, 2010) (only

recorded and affective on August 25, 2010), purportedly transferring CCB's (questionable)

interest in the Deed of Trust of record to CapOne (Exhibit "11") (More on this below).  On that

date, however, CCB was non-existent, and the named signatories could not have been, nor were

they, either officers or directors of CCB.  There is extensive evidence of record, including from

the Defendants themselves that conclusively establishes beyond any doubt that CCB was non-

existent on the date of this purported assignment, hence no assignment obtained by law,

whatsoever.  CapOne has never been the recipient of any interest in the Deed of Trust herein.

   With regard to what is a purported and tardy attempt by CBB to assign the Deed of

Trust to CapOne, being a Deed of Trust wherein CCB was not the original Beneficiary nor

Beneficiary by any prior Assignment, the same is further defective as follows:  At the time CCB

allegedly attempted to assign the Deed of Trust, CCB was out of business.  Likewise is the same

for SSB.   This ostensible attempt by CCB to make such an assignment is (Exhibit "11"), again

never seen by the Court.   Impeaching this very document is the document itself, several other

documents, admissions by the Defendants, and Requests for Judicial Notice by the Defendants

themselves (see below).

   Counsel's admissions in the pleadings appears in several places, including in Defendant

Capital One, NA's Request for Judicial Notice in Support of Motion to Dismiss Doc 18 Case

2:10-cv-01070-RLH-PAL filed on 07-16-2010, page 2, line 21 to page 3 lines 1-2:

> "Official record of Chevy Chase Bank F.S.B's status as a federal savings
> bank through July 30, 2009 regulated by the Office of Thrift Supervision,
> a true and correct copy of which is attached hereto as Exhibits L. As part
> of the Federal Deposit Insurance Corporation's ("FDIC") website, this
> public record is from the Institution Directory. It allows the general public
> to find federal savings banks and provides the latest comprehensive
> financial data. See htt://www2.fdic.gov/idasp/main.asp (follow "Find An
> Institution" hyper link; then change "Institution Status" by selecting "All"
> and "Institution Name" by entering "Chevy Chase Bank;" follow
> hyperlink "Chevy Chase Bank, F.S.B.") (last visited November 18,
> 2009)."  See footnote, "Thereafter Chevy Chase Bank F.S.B. merged with
> and into Capital One, N.A. Due to its merger, Chevy Chase Bank, F.S.B.
> no longer exists." (Emphasis supplied)

1    There is also the following recent admission by counsel for the Defendant

2  CapOne, on page 2, lines 26 - 28, of its Reply in Support of Motion for Attorney Fees

3  (Document 34, dated December 17, 2010), as follows:

4        As Capital One has stated in nearly every pleading over the three lawsuits
         filed by Plaintiff, Chevy Chase merged with Capital One and *ceased to*
5        *exist after the merger* (see, e.g. First lawsuit, Case No. 2:09-cv-02113-
         JCM-RJJ, Notice of Removal, Document No. 1)   (emphasis supplied)
6

7    The public and Court records as herein presented clearly prove that the merger was

8  completed on July 30, 2009, and, per counsel's assertions, CCB "ceased to exist."   This "cease to

9  exist" circumstance was never undone, and CCB has not existed since that date, nor does it exist

10  today, all as corroborated by other documents presented in the Exhibits filed herein.

11    The above completely impeaches any idea that (Exhibit "11"), being the purported

12  Assignment of the Deed of Trust (signed and notarized July 20, 2010) (only recorded and

13  affective on August 25, 2010) from CCB to Cap One, had any force or effect at law whatsoever,

14  indeed, it did not; hence there has never been any such Assignment to Cap One at all.

15    It must also be mentioned at this junction that (Exhibit "10"), the purported Trustee's

16  Deed Upon Sale is signed by TD on July 19, 2010, giving title to Capital One as the named

17  beneficiary, is also false and defective and *preceded* the ostensible Assignment of the Deed of

18  Trust by CCB (without authority) to Capital One that occurred thereafter (and only affective

19  upon recordation even later, on August 25, 2010).   All the more reason Plaintiff   states a case

20  both his complaint and first amended complaint of record herein.   To all of this, in light of the

21  documents discovered by Plaintiff and the admissions of the Defendants, there can be no

22  dispute.

23    The upshot of the above is that none of the dates relevant to Defendants' conduct jibe,

24  and the Note of concern was never properly endorsed to anyone, and the Deed of Trust was

25  likewise never assigned to CCB or CapOne.   At the very least, the above circumstance proves

26  that there has been a complete *separation* of the Note and the Deed of Trust, and, in this regard,

27  the law is clear:   once there is such a separation, the Note and note holder become and are

28

1   unsecured and the Deed of Trust is nullity.

2       There exists no lawful way to connect all the dots that the Defendants have put on paper

3   but left unconnected.  The Court in the matter of  *Weingartner v. Chase Home Loan*, Federal

4   District Court, Nevada, Case Number: 2:09-cv-02255-RCJ-RJJ, in its decision dated March 15,

5   2010, at page 8, lines 7 – 11, addresses this sort of circumstance as follows:

6           One cannot transfer the beneficial interest in underlying debt merely by
            assigning the security instrument.  *See e.g. Tilden v. Beckman*, 278 N.W.
7           2d 581, 586 (Neb. 1979); *Lundy v. Messer*, 167 N.W.2d 278, 279 (Ill.App.
            Ct. 1960).  "It is axiomatic that any attempt to assign the mortgage without
8           transfer of the debt will not pass the mortgagee's interest to the assignee."
            *In re BNT Terminals, Inc*., 125 B.R. 963, 970 (Bankr. N.D. Ill. 1990).
9

10  The Court goes on to say at page 8, lines 22 – 24 of the decision:

11          Defendants seem to content to let their argument rest dispositively on their
            position that MERS, by the mere language in the deed of trust, has the
12          authority to transfer the beneficial interest in the underlying debt.  This is
            rejected.
13

14      In the *Matter of Joshua and Stephanie Mitchell*, U.S. Bankruptcy Court, District of

15  Nevada, Case Number: BK-S-07-16226 –LBR, the Court in its Order dated August 19, 2008

16  echoed the above and further decided as follows For there to be a valid assignment for purposes

17  of foreclosure both the note and the deed of trust must be assigned.  A mortgage loan consists of

18  a promissory note and a security instrument, typically a mortgage or a deed of trust.  When the

19  note is split from the deed of trust, "the note becomes, as a practical matter, unsecured."

20  Restatement (Third) of Property (Mortgages) § 5.4 cmt.  a (1997).  A person holding only a note

21  lacks the power to foreclose because it lacks the security, and a person holding only a deed of

22  trust suffers no default because only the holder of the note is entitled to payment on it. See

23  Restatement (Third) of Property (Mortgages) § 5.4 cmt. e (1997).  "Where the mortgagee has

24  'transferred' only the mortgage, the transaction is a nullity and his 'assignee', having received no

25  interest in the underlying debt or obligation, has a worthless piece of paper."  4 Richard R.

26  Powell, *Powell on Real Property*, § 37.27[2] (2000).

27      The entire Memorandum and Order of the Bankruptcy Court is attached in that it also

28

addresses and decides matters related to MERS *per se*, relevant herein but not otherwise addressed for the sake of brevity, with the footnote that the said Memorandum and Order is incorporated herein by express reference as (<u>Exhibit "13"</u>).

All of the above sets out a record that corroborates the allegations of Plaintiff as set forth in his complaint and first amended complaint to the effect that the loan transaction *per se* and the very manner in which the Defendants made the loan were deceptive, non-disclosing, wrought through with chicanery, and bad faith, with all the disguises, and non-disclosures, and defects in consumer protections, notices, and the like, throughout the loan process, up to closing, and even thereafter, and was in the end both unfair, and predatory, and contrary to relevant Statutes and Regulations. Plaintiff has exercised his right to rescission, able to implement the same on terms defined by Statute, and, now, as a direct result of the defendants' own conduct, the Defendants herein have become unsecure (*if it were ever secured*) and the Plaintiff is not obligated to pay for the security of record, all per the above. (*See* 15 U.S.C. §§ 1601, 1635(b) *et al.*; *U.S. vs. Butner*, 440 U.S. 48, 54-55, (1979); *see also* Article 3 governing negotiable instruments. *See In Re Hwang*, 396 B.R. 757 (Bankr. C.D. Cal. 2008); *In Re Vargas*, 396 B.R. 511 (Bankr.C.D. Cal. 2008); *In Re Schwartz*, 366 B.R. 265 (Bankr. D. Mass.); *In re Foreclosure Cases*, 521 F. Supp. 2d (S.D. Ohio 2007); FRCP 17, FRE 803; UCC Article 3, 3-104, et seq.)

As stated above in this pleading, the conduct and the pleadings of the Defendants, and each of them, have made them into, at best unsecured Lenders and Creditor of the Plaintiff, more probably not even Creditors at all, all as a direct result of their own wrongful intentions and deceptive actions thereon. There was never any Endorsement of the Note whatsoever from SSB to CCB nor to Cap One - None. There is likewise the same problem for Cap One regarding the Deed of Trust, all as addressed herein. Hence, when Plaintiff asserts that the conduct of the Defendants have relegated themselves to the position of unsecured creditor status or no creditor status at all, that assertion has traction both in fact and law, and, frankly, has never been refuted, by testimony or documentary proof. On the face of the documents and the pleadings of record, including admissions, Cap One has no standing in this litigation or status as a creditor per se of

the Plaintiff.  All of Plaintiff's assertions, then, have merit, as does his pending litigation and Lis Pendens, in the protection of his rights under the law.  Nothing done by TD in its wrongful attempt to foreclose Plaintiff's property interest changes the aforesaid result (See below)[i].

### III.

### T.D. SERVICE COMPANY INC'S COMPLICITY AND ACTIONS AID NOT THE DEFENDANTS AND ARE IN TOTAL A NULLITY

(Exhibits "7","8","9","10","11") are Exhibits that also include documents relevant to the State action brought by Plaintiff  to void the purported foreclosure sale of  his property by a different Defendant, T.D. Service Company, Inc. ("TD"), and it includes the ostensible  Notice of Default and Election to Sell Under Deed of Trust from said Defendant  (Exhibit "7,") and the supposed Substitution of Trustee  (Exhibit "9").   As can be readily seen by an examination of the documents themselves, TD was *never* duly Substituted and appointed by MERS, nor was it so substituted by  SSB or CCB or CapOne, at the time it filed and served, and thereafter pursued foreclosure and sale all pursuant to the defective and non-conforming Notice of  Default and election to sell.  TD was not the Trustee until underline thereafter, if ever, hence anything it ever did was never in conformity with Nevada law relating to and controlling foreclosure upon real property.  Any sale by law would be, was, and is void at law, and any sale would, thus, be fraudulent upon the Plaintiff (NRS 107.080 et al.).  As for the purported  Trustee's Deed Upon Sale,  it is likewise a nullity in that TD  failed  act  in compliance with the law, all contrary to its representations in such Deed, said Trustee's Deed Upon Sale being (Exhibit "10")[5]  (*See* NRS 107.080 et seq.) and actually 'conveyed' the subject property to CapOne  ***before*** it became the Beneficiary in the Deed of Trust (if ever it did).   The alleged Trustee was not the Trustee, and the alleged Beneficiary was not the Beneficiary.  In this same regard, Plaintiff has filed a good faith *Lis Pendens* on and against the title of the subject property, and the same was properly filed

---

[5] Plaintiff further puts into dispute and no way means to admit the signatures on the supposed Trustee's Deed Upon Sale document where the Seller (Grantor) and Buyer (Grantee) at all proper in that it appears the same individual signed on both sides of the transaction.

in the face of the wrongful conduct of TD as aforesaid.[6]

It is more than noteworthy that on Sept. 1, 2011, on an identical set of facts, Judge Navarro, in another case in a Nevada District Court, found that the same fact pattern *vis a vis* TD herein was sufficient  to defeat a motion to dismiss a complaint alleging wrongful foreclosure (See (Exhibit " 14 "), being a copy of the Order).  (*Kartman vs. Ocwen LAN Servicing, LLC, et al.*, 2:09-cv-02404), Judge Navarro wrote:

> "Plaintiff alleges that Trustee Corps. filed a notice of default and intention to sell on or about June 8, 2009. On June 23, 2009, MERS substituted MTC Financial Inc. d.b.a. Trustee Corps. as trustee. "The most obvious potential defect in this foreclosure stems from the fact that Trustee Corps. was substituted as trustee after it recorded the NOD. In Nevada, the power of sale cannot be exercised until one of two particular entities – the beneficiary or the trustee — or an agent thereof  records the NOD Nev. Rev. Statute § 107.080 (2) (c). Trustee Corps. was not such an entity when it recorded the NOD. Thus, unless Trustee Corps provided evidence indicating that the beneficiary...or the trustee caused Trustee Corps. to file the NOD, it may be liable for wrongful foreclosure..." "Plaintiff has not only alleged enough facts to survive a motion to dismiss, he may have provided enough evidence to survive a motion for summary judgement. Plaintiff's evidence that Trustee Corps filed the NOD while it was still stranger to the mortgage shows there is at least a question of fact as to whether foreclosure was statutorily defective...."        NRS 107.080 5 goes on to state that such a sale may be voided by any court of competent jurisdiction.*

These are the two cases, then, with like claims, on identical facts, in the  same Federal District in which Plaintiff has sought relief.     Another Federal District Judge, in the same Courthouse, in the same time frame, on identical facts, in a well-thought-out decision, has held that such facts support a complaint for wrongful foreclosure.

Plaintiff believes that Judge Navarro's above well-thought-out eight page decision should be more persuasive than the succinct order of the District Court below from which this appeal is taken, and laid side by side with his complaint, is sufficient to state a cause of action for wrongful foreclosure.

On a related point, once a mortgage that has been the subject of rescission, as in the

---

[6] Nothing herein is intended to admit that any of the Notices and or other documents coming from TD, or any other of the named Defendants, are not otherwise defective, which, in fact they are, specifically as to Plaintiff being in default, the amount of any such default, and the like, all of which is disputed.

instance case, a Lender cannot foreclose upon the subject property. (*Yslas v. K.K. Guenther Builders, Inc.*, 342 So.2d 859 (Fla. 2d D.C.A. 1977).  *Also see Beach v. Great Western Bank*, 670 So.2d 986 (Fla. 4th D.C.A. 1996)).  Allowing Defendants to proceed with the foreclosure and to recognize the same would deny Plaintiff the benefit of rescission and or his day in court and essentially constitutes a prejudgment of the case without any consideration whatsoever of the merits of the 15 U.S.C. § 1635 claims.

Even if the said Substitution of Trustee (Exhibit "9") were signed on time and before the Notice of Default (Exhibit "7") (which it was not) by the ostensible officers of Chevy Chase Bank FSB, the holder of the Note and payee on its face was Silver State Bank (SSB), not Chevy Chase Bank FSB, and no one from SSB ever signed any Substitution of Trustee.  Likewise, there was never any endorsement and transfer of the underlying Note from SSB to Chevy Chase Bank FSB, whatsoever, and if there were one, the same was never disclosed to Plaintiff as required by law (15 U.S.C. § 1641).  The same is true of the Deed of Trust in that there is no assignment of the same from SSB to CCB whatsoever.[7]

## IV.

## ASSIGNMENT OF THE NOTE AND DEED OF TRUST UNDER TILA *PER SE*

Plaintiff has addressed in some detail the broad and significant issues related to Assignment as above mentioned, yet there is more.

Any purported assignment from Defendant SSB, payee on the note, to CCB and or Cap One, must by law be disclosed to Plaintiff,[8] and, again, there is no such disclosure of record, at any time, at or after Closing, and failure to disclose is another violation of TILA that too provides Plaintiff herein with a right to rescission that voids the security (all as addressed in the above, witness what the Court decides in *White vs. Homefield Financial, Inc.* (U.S. Dist. Ct, W.

---

[7] In all of this regard - - should Chevy Chase Bank now assert that no endorsement of the Note or Assignment of the Deed of Trust was necessary in that it was the original Lender, this assertion would contradict Defendants' documents and impeach both the Defendants' previous representations of record  to the contrary and their respective credibility.

[8] There is no dispute regarding Non-Disclosures of Assignment is a violation of TILA and Defendant's own Loan Servicing Disclosure Statement "Stamped" CCB/Barnhart page 69 of 194 confirms.

1  Dist. Washington (Case No. C07-5114 RJB), 2007 U.S. Dist. Ct. Motions 5114; 2008 U.S. Dist.

2  Ct. Motions LEXIS 5192) concerning assignment and nondisclosure:

> Additionally, Meyer, further expresses that it is a TILA violation to not provide information regarding a loan assignment, which Defendant Countrywide to date still has not provided the address or phone number of the Bank of New York, who has belatedly claimed that they received assignment from Defendant Countrywide within several days of purchase of this mortgage. Ibid. at 16. See Exhibit 5; Declaration of E. Allen Walker. Interestingly, Defendant Countrywide was a party to the Meyer case. In that case, they (as here) did not disclose who the true "owner" was. Ibid at 17. This is the type of outrageous unclean hand type conduct that _fully justifies this Court in not only granting a rescission, but in granting damages and finding that the length of time that has passed since Plaintiffs requested rescission on November 9, 2006 (not to mention previous loan file information requests) (as admitted by Defendant Countrywide), justifies Plaintiffs in receiving their [**25] home free and [*15] clear entirely of Defendant Countrywide's mortgage. See 15 U.S.C. § 1641; Murray, Supra., 245 B.R. at 34 (it is an appropriate remedy where equitable to do so, to eliminate the debtor's entire obligation to the creditor)._ **REPEATED PREDATORY ASSIGNMENTS.** It is clear that this is not the first time Defendant Countrywide has attempted to get away with predatory practices by not disclosing who it assigns the mortgage to. It is interesting that Defendant Countrywide in the Meyer case, actually failed to provide full discovery in regards to the "owner" and the status as is the case in this case to an extent. Ibid. They blamed the Plaintiff for insufficient discovery requests. This is familiar. See objections in Exhibit 5. **PRIOR ACTUAL LENDER** _Defendant Countrywide attempts to cite caselaw that would preclude Plaintiffs from being granted rescission because Defendant Countrywide is only a "loan servicer and not lender". See Miguel v. Country Funding Corp, 309 F.3d 1161, 1165 (9th Cir. 2002). However, as Exhibit 6 demonstrates, Defendant Countrywide has been an actual "lender/investor" [**26] in this case, and was the lender represented to Plaintiffs that purchased the mortgage from the original mortgage broker. Discovery has disclosed that Defendant Countrywide indeed has much filthier hands than Plaintiffs._ Defendants Countrywide's pattern involves a bait and switch approach except that the switch is marginally and inadequately at best disclosed but yet follows Defendant Countrywide's (in published case reports) pattern. As far as Plaintiffs were aware at all relevant times, Defendant Countrywide has been the relevant assigned lender. (Emphasis supplied)

20  In this regard, Defendants, by and through Counsel, have alleged that CCB/CapOne

21  acquired said loan through assignment (page 4, lines 13 – 17, of Defendants' Motion to Dismiss

22  (Document Number 16, July 16, 2010) - - Quoting opposing Counsel's assertion:

> Plaintiff does not allege that he had any dealings with Capital One before the loan was assigned to Capital One. Nor does he allege that Capital One had any involvement in any in alleged misrepresentations made by Silver State Mortgage.

26  And, Defendants further state, on page 5 lines 4-6 of the pleading:

"This is not a situation where Capital One, as assignee of the loan made by Silver State Mortgage – a fact already determined by this Court"

The circumstance for the Defendants is as follows:   If CCB/Cap One is the original lender that used SSB as its disguise, the Defendants' loan documents and the notice of rescission are all defective, violates TILA, and provides Plaintiff  his rescission, and voids the security;  If CCB/Cap One is the assignee, Defendants  never disclosed to same to the Plaintiff (nor recorded it),  the Defendants' loan process is defective, violates TILA, and provides Plaintiff  his rescission, and voids the security.   There is no honest way for the Defendants to now plead around this self-made dilemma.

At the time of this Court's decision of concern regarding Defendants' full disclosure conduct in accordance with TILA, and the like, (a) it was not privy to the above, nor was it aware that (b) the documents and related case law provided to it herein, the said documents as presented in the Exhibits hereto not having been provided to the Court by the Defendants, hence (c ) there is now before the Court a record of  numerous non-disclosures, one admitted by the Defendants concerning negative amortization, others on the ability to repay, hidden financial charges that impact non-disclosed interest rates, fees, and costs, undisclosed rates and payments, undisclosed payments of "kickbacks,"  (d) here too, per the above, the question of Defendants conduct from before making the loan to after foreclosure, assignment and non-disclosure too (this includes foreclosure by TD when it was *not* a Trustee whatsoever and its deed upon sale to Cap One when it was *not* the beneficiary whatsoever, all as shown herein - -none of this conforms to State or Federal law) ;   in addition, (e)  there is (on multiple levels) the defective notice already in part recognized by this Honorable Court, with the further comment that the subject notice was defective in more ways than just mere copies and service of  the same on the Plaintiff, including but not limited to defects on its face, signatures, and dates, and in the manner of presentation, being  all on one day,  and also not to  both borrower and any other persons with ownership claims;   moreover (f) also now known  non-disclosure (attempt at concealment)  of the actual originator and Lender of  the subject loan, along with non-disclosure of any alleged assignment, and the upshot, being confusion as to title and separation of the note and deed of

trust so as to render the Defendants unsecured creditors or not creditors at all, and, (g)  the affect

of Plaintiff's actual rescission herein  that voids Defendants' security (if ever they were secure)

per Defendants' failure to reply, which is too a violation of TILA and bars any subsequent

foreclosure (failing to grant rescission within 20 days of when it was requested. *See McNinch v.*

*Mortgage America, Inc*, 250 B.R. 848, 860 (Bnkr. W.D. Pa. 2000) (holding that it is a separate

TILA violation for not honoring a proper rescission request.  *See Williams V. Gelt Fin. Corp*, 237

B.R. 590, 599 (E.D. Pa 1999);  and (h) the related but overriding issue concerning the conduct of

the Defendants and their handling of the documents in the making of  and handling the subject

predatory loan that, to the Plaintiff (per the above),  rendered them nothing more than unsecured

Creditors, if Creditors at all.

## V.

## **RESCISSION**

With regard to what might appear to be the severe consequence of rescission and voiding

of  security, the Courts have approvingly commented on the same with reference to

Congressional intent, as follows (*White vs. Homefield Financial, Inc*. (U.S. Dist. Ct, W. Dist.

Washington (Case No. C07-5114 RJB), 2007 U.S. Dist. Ct. Motions 5114; 2008 U.S. Dist. Ct.

Motions LEXIS 5192):

> *Quenzer v. Advanta Mortgage Corp*, 266 B.R. 760, 767 (Bnkr. Ka. 2001)
> provides a helpful examination of rescission issues.  Even when § 1635
> applies, the right of rescission can be limited to three days by giving
> proper notice of the right and the other disclosures required by the TILA.
> As the dissenting judge put it in Palmer v. Wilson:
>> Of course, the rescission of a creditor's security interest is a
>> harsh remedy if that debt is not otherwise collectible, but
>> the [creditors] could have avoided it by complying with the
>> requirements of the [TILA].

Plaintiff's Motions for Clarification and Reconsideration (unopposed) are made in good

faith and have merit, per the above, same to for his opposition to expungement, and, as he has

tried to demonstrate herein, his First Amended Complaint is proper.

## VI.

1

**LIS PENDENS**

2      Pursuant to all of the above, the Lis Pendens on the property as prepared and filed in

3    good faith by the Plaintiff consistent with applicable Nevada law is proper and should remain,

4    and the suggestion by opposing counsel in its Motion to Expunge Lis Pendens (Document

5    Number 56, dated December 15, 2010), on page 1, lines 23 - 24, as follows, "Because there is

6    effectively no viable claim remaining with respect to the third lawsuit, this second lis pendens

7    should be removed " has no foundation in fact or law, and, contrary to the same, as has been

8    detailed for the Court in the above, it is actually the Defendants, including CapOne, that have

9    conducted and plead itself out of standing or status to assert any claim whatsoever against the

10   subject property, as either a secured or unsecured creditor.   There is thus no basis for the

11   removal of the Lis Pendens pending a final determination in this litigation per the above.

12

**VII.**

13

**FIRST AMENDED COMPLAINT**

14     Plaintiff's proposed First Amended Complaint was and is filed in good faith, consistent

15   with his understanding of the Court's Order and the record herein, all as more fully set forth in

16   the above, and, in this regard, even his fraud claims seem to him to be consistent with the Order,

17   considering the status of the disputed and to him fraudulent foreclosure by TD.  It is not possible

18   for the Plaintiff to plead all in that he still does not know all, and many matters are subject to

19   discovery, witness what has been demonstrated above, and, the Plaintiff, even after trial, may

20   have to move to amend his pleadings to conform with proof, which is not unusual in complex

21   litigation.

22

**VIII.**

23

**ATTORNEY FEES AT ISSUE**

24     There is also in the record a Motion for Attorneys Fees by the Cap One (Document

25   Number 28, dated November 22, 2010 and the motion should too be denied, consistent with the

26   continuing and contested nature of the record herein, addressed in great part in Plaintiff's

27   Response (Document Number 31, dated December 7, 2010).  In addition thereto, and in light of

28

the revelations herein that Cap One has been *less than forthright with this Honorable Court,* witness the alternative documents and facts established herein, Cap One is neither entitled to or deserving of a fee award, and the motion should be denied.

### IX.

### <u>CONCLUSION</u>

Before its demise (as a result of questionable business practices), CCB enjoyed the reputation of being a calculating enterprise, one that devised, according to Joe Carrillo Professor of Law, University of California, Hastings College of the Law in The Sound of Silence: Class Action Declaratory Rescission Under the Truth in Lending Act (Dated August 21, 2008), the most sophisticated loan in history . . . "   The merger  Defendants brag on was essentially funded to the tune of $520 million by the U.S. Taxpayers, a merger and money that directly benefited Cap One , and Cap One, itself is a sophisticated, multi-billion dollar institution, with thousands of employees and up to hundreds of lawyers on staff and or retained.  CCB and Cap One put all the dots on paper in this instance transaction (and thousands more transactions just like it, for which Cap One has been held liable, witness <u>Exhibit "15</u>," the Decision of the Court in (*Andrews. Vs. Chevy Chase Bank*, Case No. 05-C-0454) as well as in the settlement of *California vs. Wells Fargo, N.A.*, (December 21, 2010), again concerning the same loan as Barnhart's,[9]

---

[9] Brown Reaches Settlement With Wells Fargo Worth More Than $2 Billion to Californians With Risky Adjustable-Rate Mortgages - LOS ANGELES - Attorney General Edmund G. Brown Jr. announced today that Wells Fargo has agreed to provide loan modifications worth more than $2 billion to thousands of California homeowners with "pick-a-pay" loans and to pay an additional $32 million to thousands of borrowers who lost their homes through foreclosure. None of the loans were made by Wells Fargo. All were originated by World Savings and Wachovia, banks Wells Fargo acquired.

"Customers were offered adjustable-rate loans with payments that mushroomed to amounts that ultimately thousands of borrowers could not afford," Brown said. "Recognizing the harm caused by these loans, Wells Fargo accepted responsibility and entered into this settlement with my office."

The pick-a-pay, or pay option adjustable-rate, mortgage loans allowed borrowers to make payments at various levels. The highest level fully covered the monthly interest and principal due. Another level covered interest only. At the minimum level, payment was insufficient to cover the monthly interest owed, and the unpaid interest was added to the loan balance.

Ultimately, the loans would reset, increasing the monthly payments dramatically.

The settlement with Wells Fargo covers loans made by World Savings Bank, a subsidiary of Golden West Financial Corp., and Wachovia Bank. Wachovia purchased World Savings in 2006, and Wells Fargo then acquired Wachovia in 2008.

Under the settlement, Wells Fargo will offer affordable loan modifications to an estimated 14,900

1    and no matter their cunning, they failed to connect those dots, violated Law and Regulations,

2    failed to make required disclosures and provide mandated and proper notices, and thereby

3    rendered themselves unsecured creditors (if creditors at all),  and this Honorable Court should

4    likewise hold Defendants accountable by and under the Law.

5            Plaintiff has alleged all of the above in of his various pleadings of record, all of which

6    have merit, raise triable issues of fact and law, and include his right to and exercise of rescission,

7    all within any applicable statutory period of time.  Plaintiff thereon asserts that he is entitled to

8    title to the subject property free and clear of any and all claims of the Defendants and each of

9    them, in their present and postulated form that in fact and at law have no substance whatsoever.

10           As such, Plaintiff respectfully requests the following relief:

11           Plaintiff's Motion for Clarification (Document No. 53, dated December 9, 2010) should

12   be granted relevant to the Court's Decision dated December 1, 2010, allowing Plaintiff to

13   proceed, including with his First Amended Complaint, for rescission and related relief thereon

14   consistent Defendants' conduct as alleged herein, the manner in which they made the loan of

15   concern, prepared documents and notices, and served same, nondisclosures of record, up to, at,

16   and after Closing;

17           Plaintiff's Motion for Reconsideration (Document No.32, dated December 7, 2010)

18   should be granted relevant to the Court's (Hon. J. P. Pro) Decision Dated November 19, 2010, to

19   reverse the decision to dismiss Plaintiff's action against T.D. Service Company, Inc. to recognize

20   the foreclosure as void under Nevada Law; and

21           Defendant's Motion for Reconsideration (Document No. 57, dated December 16, 2010),

22   Motion to Expunge (Document No. 56, dated December 15, 2010), Motion for Attorney Fees

23
24   California borrowers with pick-a-pay loans made by World Savings or Wachovia. Many of the modifications will
     include significant principal forgiveness. The total value of the modifications mandated by the settlement is
25   projected to be more than $2 billion.
            Wells Fargo is also required to pay $32 million in restitution to more than 12,000 pick-a-pay borrowers in
26   California who lost their homes through foreclosure, plus approximately $1.8 million in costs to the state. Payments
     to foreclosed homeowners are expected to average more than $2,650.
27          Wells Fargo has reached settlements over pick-a-pay loans with attorneys general of several other states,
     including Arizona, Colorado, Florida, Illinois, Nevada, New Jersey, Texas and Washington.
28

1   (Document No. 28, dated November 22, 2010), and Motion to strike Plaintiff's First Amended

2   Compliant (Document No. 60, dated December 27, 2010) should be denied.

3

4   Respectfully submitted,

5

6   Dated: January 1, 2010

7                                                    /s/ Jude E. Nazareth

8                                                    _____
                                                     JUDE E. NAZARETH, ESQ.
9                                                    Nevada Bar No. 10695
                                                     Post Office Box 401506
10                                                   Las Vegas, Nevada 89140
                                                     (702) 948-7474
11                                                   Attorney for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3        I certify that on this 1st day of January, 2011, I did serve via Case

4   Management/Electronic Case Filing, a copy of the above and foregoing:

5        **Omnibus Response and Reply**

6   Addressed to:

7        Miranda Du, Esq.
         Kristen T. Gallagher, Esq.
8        McDonald Carano Wilson LLP
         2300 W Sahara Avenue, Suite 1000
9        Las Vegas, NV 89102

10       *Attorneys for Capital One, N.A.*

11

12       Gregory L. Wilde, Esq.
         Kevin Soderstrom, Esq.
         Wilde & Associates
13       208 South Jones Blvd.
         Las Vegas, NV 89107
14

15       *Attorneys for T.D. Service Company*

16

17                                          /s/ Jude E. Nazareth

18                                          _____
                                            JUDE E. NAZARETH, ESQ.
19

20

21

22

23

24

25

26   _____

27

28